**EMERSON ELECTRIC CO., Appellant,**

v.

**Guy F. FARMER, Appellee.**

**No. 28107.**

United States Court of Appeals, Fifth Circuit.

June 15, 1970.

Lloyd Leemis, Jacksonville, Fla., M. Reese Dill, Cleveland, Ohio, for appellant.

Edward S. Parrish, Jr., James A. Fischette, Jacksonville, Fla., for appellee.

Before JOHN R. BROWN, Chief Judge, and COLEMAN and CLARK, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This case involves a little thermal electronics, a little of the romance of business acquisitions through debt positions, a little plain and fancy misrepresentation of the products' proficiency, and a little Florida law on fraud. But mostly it involves the more prosaic problem of the use of F.R.Civ.P. 41(b)[1] on dismissals on the merits at the close of the Plaintiff's case. What complicates it is not the misuse of the rule so much as it is the contradictory findings and conclusions resulting from findings and conclusions now called for and those inherent in the demurrer like acceptance of the Plaintiff's evidence by assuming its full truth. The upshot is that we must reverse and remand for further proceedings.

The outline can be greatly streamlined by our repeating or paraphrasing the Trial Court's specific findings.[2]

At the time of the events alleged here, Emerson was one of the leading manufacturers of electrical motors for use in cooling and refrigeration appliances of the conventional coil-compressor variety. It therefore had a vital interest in any developments in electronics which could cause obsolescence of its products or offer a potential for better ones. For a number of years major manufacturers of refrigeration equipment had been seeking substitutes for the coil-compressor system without any major breakthrough. Though Emerson was not directly engaged in this type of research, it followed it closely so as to be aware of any new developments that might affect its interest. Indeed, a management policy was to exploit the research and de-

1. "For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against him. After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits."
F.R.Civ.P. 41(b).

2. In the rare instances in which we reject fact or fact-law findings we specifically point this out.

velopment of other companies through acquisitions.

What the refrigeration industry had been looking for was how to exploit through practicable commercial applications the century old "Peltier" principle whereby a temperature differential[3] is created when direct current is passed from one metal conductor or semi-conductor to another of different composition. In measuring the efficiency of refrigeration systems, one must determine the BTU's (British Thermal Units) and the Delta T from which a COP (Co-efficiency of Performance) is calculated. A thermoelectric system to be competitive with the coil-compressor system would have to have a comparable initial cost and a COP of .67.

Emerson became very interested in the Defendant because of an industry magazine article relating to Guy Farmer, the Defendant, and AFCO, a company in which he was a director and financially interested. The article bore the catchy title, "Cool It, Man, in Solid State", with a picture of Farmer as the inventor or inventive genius standing next to the president of AFCO, self-described as a "peddler". The article in extravagant terms reported AFCO's estimate of 2,000 applications for their discovery, the transistor compressor, and an expected gross sales of 2 million dollars.

Pursuing this revelation, Emerson sent Richard Lindgren, a non-technical vice-president, to the AFCO plant in Florida. While there he was in contact with Farmer and was shown various machines. Farmer's statements led Lindgren to believe that Farmer had made a break-through in the technology of thermo-electricity. Also believing this, Emerson's management, on March 28, sent the research and marketing vice-president for a personal inspection and conference. Farmer gave another tour of the plant, displayed his appliances and made statements to the visiting representative about the efficiency of and the cost of his modules (transistors). Farmer not only represented that his system was competitive both in initial cost and in operating cost with conventional coil-compressor systems, but represented that his new modules would perform at given and stated capacities. Farmer's statements made to Emerson executives March 28–30 were specific in details as to BTU's, wattage, Delta T, and in other technical areas, and were made in connection with the display of AFCO's 200 pound ice maker which Farmer said was not in operating condition at the time.[4]

These reports brought the president of Emerson to Florida on March 29 who likewise was in direct contact with Farmer. He and his associates asked for an audited statement of AFCO's financial position and an opportunity for Emerson to have scientific-industrial tests made on the machines and modules since no such facilities were there available in Florida. Farmer and AFCO declined these requests since, as Emerson had previously been advised, there was another group in the wings willing on the very next day to put the $300,000 in the enterprise.

The trade was made, the $300,000 loan was made, the note was signed by AFCO, and Emerson thought it had acquired

---

3. Called the "Delta-T".

4. The Judge was equally specific in his findings:

> 9. "The Defendant [Farmer] stated that he had made an ice machine (operated by thermo-electric modules) that would produce 200 pounds of ice per day utilizing 640–680 watts of power input and 70 degrees tap water at the rate of 15 gallons per hour. Such a result, if true, would indicate a COP of .67 and would be competitive with a coil-com-pressor system. Defendant also stated that he had developed a 17 element thermo-electric module pumping 40 BTU's at Delta T of 40 degrees F; and a 24 element module pumping either 185 BTU's at Delta T of 70 degrees F or 80 BTU's at a Delta T of 120 degrees. The 80 BTU figure indicated a thermo-electric module suitable for a refrigeration system that would be competitive with the conventional coil-compressor system."

equity options in a solvent company. Then, we may interpolate, came the dawn.

Within a few weeks audits were completed, tests were made, and little was as represented. AFCO was insolvent; it did not own the "patent" since Farmer had a reversionary right in event of insolvency, and worse, the breakthrough was a breakdown: the machine was a failure.[5]

Before getting involved in the legal significance of all of these paraphrased findings the Trial Judge summed it up this way. "Despite the fact that [Farmer] had claimed a breakthrough in pumping capacity as well as in the cost of his modules, [Emerson's] tests showed [Farmer's] claims were inaccurate and overstated."

Now come the complications, none of which inhere in or arise either out of the facts or out of the Florida law. After inviting a motion under F.R.Civ.P. 41 (b), note 1, *supra*, to be made at the conclusion of the Plaintiff Emerson's case, the Judge deferred action as he most certainly may. But the invitation was renewed when the Defendant Farmer's evidence was closed. Although nominally a judgment also entered on a 41(b) motion after all evidence,[6] it is plain that the Judge treated it operationally as one testing the sufficiency of the evidence if fully credited.[7] Indeed, the Judge said that very thing by conclusion 3 that Emerson "has wholly failed to prove a prima facie case, *assuming that all of the evidence introduced by the Plaintiff [Emerson] on its case in chief is true.*"

At the outset the legal conclusion on an *arguendo* acceptance of truth is a flat contradiction of the earlier specific findings which we have capsulated above, although the acceptance of truth is consistent with at least most of those findings. The case therefore has an importance transcending the private *Erie* interest. For much of the problem comes from the Judge's not following 41(b) as its 1948 amendments contemplated.[8]

---

5. With equal precision the Judge found (and credited) the tests for Emerson which are in sharp contrast to Farmer's specific claims (see note 4, *supra*):

   "17. Tests thereafter made by [Emerson] with modules furnished by [Farmer] and run according to [Farmer's] directions disclosed that his thermo-electric devices would not operate with the efficiency claimed; and that they could not be used to provide a system of refrigeration competitive in initial costs or operational costs with the coil-compressor system. Specifically, the tests of the Defendant's 17 element module produced 9 BTU's against the 40 claimed by [Farmer]; on a 24 element module, 18 BTU's against the 185 claimed by [Farmer]; and on the other 24 element module, [zero] BTU's against the 80 BTU's claimed by [Farmer]. The best COP of any of the modules was .28 as against the .67 needed to be competitive and as against .67 indicated by [Farmer's] statements to [Emerson] * * *. The module was ⅒ as efficient as claimed and would require two and one half times the wattage used in the current system."

6. Conclusion 9 states:

   "9. The motion of the Defendant [Farmer] for an involuntary dismissal under Rule 41(b) at the close of all the evidence is also granted."

7. In announcing his decision in open Court the Trial Judge stated:

   "So under those circumstances, I doubt seriously if it will be necessary for me to make findings of fact and conclusions of law which I would be required to do if I decided the case on the merits based on all the evidence.

   And that will give you the opportunity to go right to the Court of Appeals on that sole question of whether or not you made out a prima facie case under Florida Law in an action at law based upon fraud and deceit."

   \* \* \* \* \*

   "* * * what I've done is try to make it clear that I'm deciding the case just the same as if I decided it at the close of the Plaintiff's case without the Defendant having put on one iota of testimony * * *".

8. The critical conclusions of law pertaining to fraud were

   "3. The plaintiff has wholly failed to prove a prima facie case, assuming that

As Professor Wright points out, "Before the 1948 amendment of Rule 41, some courts held that * * * the Court was required merely to determine whether the Plaintiff had made out a prima facie case. In this view the question was, not whether the Plaintiff's evidence showed a right to recovery, but whether it was sufficient in the sense that if there were a jury, it would warrant submission of an issue to the jury." 2B Barron and Holtzoff, Federal Practice and Procedure, § 919 at 151 (Wright ed. 1961). In essence the Court was treating a 41(b) motion as a motion for a directed verdict. Before 1948 this view had been adopted by the Third and Fourth Circuits. But the Sixth, Seventh, and Ninth Circuits had held that in a non-jury case the Court is supposed to act as Judge and as jury. The Court had the right to use its full judgment on the weight and credibility of the Plaintiff's evidence and should make its decision on the motion on the basis of all the evidence before the Court. See 5 Moore, Federal Practice, ¶ 41.13[4] at 1156 (2d ed. 1969) and cases there cited. "The reasoning of those decisions (of the Sixth, Seventh, and Ninth Circuits) was the basis of the amended rule which must now be followed." Wright, *supra*, at 152. The Judge should now ordinarily evaluate the evidence without making special inferences in the Plaintiff's favor.[9] The Court should go ahead and resolve the case on the basis of preponderance of the

evidence. Ellis v. Carter, 9 Cir., 1964, 328 F.2d 573, 575. This Court subscribed to this view as early as Benton v. Blair, 5 Cir., 1955, 228 F.2d 55, and for the full Court Judge Godbold stated recently, "When the defendant makes a Rule 41(b) motion to dismiss for insufficiency of the plaintiff's evidence *it becomes the duty of that court to weigh and evaluate the evidence*" (emphasis added). Weissinger v. United States, 5 Cir., 1970, 423 F.2d 795, 798 (en banc).

Why this is something more than a technical transgression is revealed by the quandary the Trial Judge's technique leaves us in. For example, in the specific findings the Court finds flagrant misrepresentation of specific capabilities obviously within the expertise of the claimed discoverer Farmer. The *arguendo* acceptance of those facts is also inherent in conclusion (3), note 8, *supra*. But then comes along conclusion (4) which states that Emerson failed to prove false representation of facts, known by Farmer to be false (conclusion (5)).

Just what has the Judge done? What has he meant to do? The enigma wrapped in a mystery becomes enshrouded in fog upon considering conclusion (6). The Court declares that Emerson failed to prove reliance (inducement) because Emerson's president testified that the reason the loan was completed was its desire to outrace the other group of investors. But would it—could it—have

all of the evidence introduced by plaintiff on its case in chief is true.

4. Plaintiff has failed to prove any false statement made by defendant concerning a specific material fact, and the evidence shows expressions of opinions by defendant rather than false statements of material fact.

5. Plaintiff has failed to prove that defendant had knowledge that the representations were false.

6. Plaintiff has failed to prove that the representations made by defendant induced plaintiff to loan $300,000.00 to AFCO, because the president of the plaintiff company testified that the main reason plaintiff went ahead and made an investment of $300,000.00 was

because the other group were ready, able and willing to invest $300,000.00, and plaintiff did not want to take any chances on the other group getting ahead of them by closing the deal first.

9. "Accordingly, the trial court [is] not required to deny the 41(b) motion even if the evidence, viewed in a light most favorable to the plaintiff, [makes] a prima facie case." Ellis v. Carter, 9 Cir., 1964, 328 F.2d 573, 577.

Obviously there will be instances in which using the demurrer-motion-to-dismiss concept is appropriate where under no interpretation or crediting of the evidence would afford any conceivable basis for recovery.

made any such apparently decisive holding had the Court found affirmatively as a fact, not just an arguendo assumption, that Farmer had made false statements of material specific facts which were chargeable to his knowledge? Doubtful as that result would be after actual fact finding, the uncertainties at this stage are too many to permit us to assume that the assumption was acceptable. Indeed, the shorter the time for testing, the more urgent the necessity for making a decision to invest or not to invest, perhaps the greater need for information and reliance on it.

■ These difficulties are enhanced upon considering the Florida correctness of several of the conclusions (note 8, *supra*) quite apart from internal inconsistencies. On the precise fact findings made (see notes 4 and 5, *supra*) we are clear as to three things. First, if the Court finds that Farmer made these representations, they are then representations of material fact.

Cases in Florida have liberally regarded statements to be factual in nature, rather than opinion under comparable circumstances. Thus in Upchurch v. Mizell, 1905, 50 Fla. 456, 40 So. 29, a statement made recklessly as to the character or financial condition of a prospective purchaser was held actionable where the defendant implied that he had knowledge of facts on which the opinion was based. And in Ramel v. Chasebrook Construction Co., 1961, Fla.App., 135 So.2d 876, a seller's statement with respect to the foundation of a new house that it was "well constructed" was actionable. Similarly, in Nocatee Fruit Co. v. Fosgate, 5 Cir., 1926, 12 F.2d 250, a misrepresentation as to the acreage of orange groves was held actionable. In Houchins v. Case, 1939, 138 Fla. 368, 189 So. 402, misrepresentation that stock in a certain company was a first class

and safe investment and the company was in good financial condition was held actionable. Also a cause of action for fraud was recognized by the Florida court in Hinson v. Drummond, 1929, 98 Fla. 502, 123 So. 913, when the misrepresentation concerned the solvency of a bank. This is particularly so in view of Farmer's claimed knowledge in contrast to that of Emerson which was seeking knowledge and tests.[10] Second, being *facts*, the statements were not, as the Judge concluded, representations of mere opinion. Third, if made as precisely found, Farmer is charged as a matter of law with knowledge of their falsity.

■ It would be a strange result if an inventor who made serious misstatements about the capabilities of the device was held to be innocent of such misstatements especially about actual performance on test runs. Florida law has made this recognition, for unlike some other jurisdictions, Florida holds the representer liable in fraud for erroneous statements negligently made. In Bobby Jones Garden Apartments, Inc. v. Suleski, 5 Cir., 1968, 391 F.2d 172, 177 we have summarized the Florida law:

"The Florida law of actionable misrepresentation was recently capsulated into the following elements in Kutner v. Kalish, Fla.Dist.Ct.App., 1965, 173 So.2d 763, 765:

'(1) a misrepresentation of material fact.

(2) (a) knowledge of the representor of the misrepresentation, or, (b) representations made by the representator without knowledge as to either truth or falsity, or, (c) representations made under circumstances in which the representor ought to have known, if he did not know, of the falsity thereof.

---

10. Thus "a statement by a party having exclusive or greatly superior knowledge may be regarded as a statement of fact, although it would be considered an opinion if the parties were dealing on equal terms." 14 Fla.Jur. 539.

(3) an intention that the representation induce another to act on it, and

(4) resulting injury to the party acting in justifiable reliance on the representation.'

See Joiner v. McCullers, 1947, 158 Fla. 562, 28 So.2d 823; Watson v. Jones, 1899, 41 Fla. 241, 25 So. 678; Wheeler v. Baars, 1894, 33 Fla. 696, 15 So. 584. We have set out the Florida elements of fraud in full above because its law is different from most jurisdictions in that the representor does not have to have knowledge of the falsity of his statement to be held liable. Instead, negligent misstatement is enough. See Watson v. Jones, 1899, 41 Fla. 241, 25 So. 678, where the Court said that 'when it is shown that the statement was material and false, and that the defendant's situation or means of knowledge were such as to make it incumbent upon him as a matter of duty to know whether the statement was true or false, the conclusion is almost irresistible that he did know that which his duty required him to know.' Id. at 254, 25 So. at 682. Of course we realize, as do the Florida Courts, that this formula—negligence equals knowledge —is a fiction. But fictions can be useful to plug up holes in legal theory. Thus to provide a remedy where the rigidity of the fraud action failed, Florida has held a representor liable for negligence. Cf. Derry v. Peek, 1889, 14 App.Cas. 337; see generally Prosser, Torts § 102 (3d ed.1964)."

The case must go back for reconsideration and fact finding in the light of this opinion. We leave initially to the Trial Judge the extent to which, if any, it may be appropriate for further evidence. We would emphasize that we have not held any fact finding clearly erroneous, F.R.Civ.P. 52(a). That testing will come, if ever, upon full fact finding in fact.

Reversed and remanded.