**Omega R. AUTRY, Plaintiff,**

v.

**NORTH CAROLINA DEPARTMENT OF HUMAN RESOURCES, Defendant.**

No. C–C–85–131–P.

United States District Court, W.D. North Carolina, Charlotte Division.

Aug. 22, 1986.

---

Shelley Blum, Charlotte, N.C., for plaintiff.

William Briley, Ann Reed, John R. Corne, N.C. Dept. of Justice, Raleigh, N.C., for defendant.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER was heard before the undersigned on July 22 and 23, 1986, during this Court's Non-Jury Civil Term in Charlotte, North Carolina, on a Complaint filed by the Plaintiff, Omega R. Autry, against her employer, Defendant North Carolina Department of Human Resources. In her Complaint, the Plaintiff alleges that the Defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.,[1] by failing to promote her, by maintaining a racially biased work environment, and by retaliating against her for filing a charge of discrimination against it with the Equal Employment Opportunity Commission ("EEOC").

The Plaintiff was represented at the trial by Shelley Blum, Attorney at Law. The Defendant was represented by John R.

---

**1.** By its Order filed February 27, 1986, the Court dismissed the Plaintiff's other claims against the Defendant, which were brought pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1981, and the thirteenth and fourteenth amendments to the United States Constitution on the ground that the eleventh amendment to the Constitution bars those claims against this Defendant.

Corne, Assistant Attorney General of the State of North Carolina. At the close of the Plaintiff's evidence, the Defendant moved pursuant to Rule 41(b) of the Federal Rules of Civil Procedure for dismissal of the Plaintiff's action on the ground that upon the facts and the law the Plaintiff had shown no right to relief. The undersigned granted the Defendant's Rule 41(b) Motion to dismiss for insufficiency of the Plaintiff's evidence in open court after weighing and evaluating the evidence presented during the Plaintiff's case. *See Holmes v. Bevilacqua,* 794 F.2d 142, 147 (4th Cir. 1986) (Rule 41(b) requires judge, as trier of fact, to weigh and consider all evidence); *Emerson Electric Co. v. Farmer,* 427 F.2d 1082, 1086 (5th Cir.1970) (when defendant makes a Rule 41(b) motion to dismiss, court should ordinarily evaluate evidence without making special inferences in plaintiff's favor).

In accordance with Rule 41(b), the Court enters the following findings of fact and conclusions of law on the basis of the testimony and exhibits presented at the trial:

## FINDINGS OF FACT

(1) The Plaintiff, Omega Autry, is a thirty-five year old black female citizen of the United States who resides in Mecklenburg County, North Carolina. She has a high school diploma and earned a Bachelor of Arts degree in English and French at Johnson C. Smith University. Plaintiff's Exhibit 7.

(2) The Defendant is an agency of the State of North Carolina and operates the Charlotte-Mecklenburg Child Support Enforcement Agency ("the Agency").

(3) The Plaintiff testified that she began working as a Child Support Enforcement Agent II ("Agent II") in the Agency's Union County office in March 1976 and transferred to the Charlotte office in that capacity on January 8, 1982. She continues to be employed by the Defendant as an Agent II at the Agency in Charlotte. Her performance as an Agent II has been consistently evaluated by her supervisors on their Work Performance Planning Reports as average or above average.

(4) In July 1983, the Plaintiff and five other Agent IIs in Charlotte submitted applications for promotion to the position of Child Support Supervisor I ("Supervisor I"). The pool of applicants, who all met the minimum qualifications for the job, consisted of three black females, two white females, and one black male.

(5) The recruitment standards as outlined in the State's job description for the position of Supervisor I were as follows: *Knowledges, Skills, and Abilities* —Thorough knowledge of Child Support Enforcement Program, related legal procedures, judicial operations, and office management techniques. Skill in interviewing, investigating, analyzing case variables. Ability to organize and summarize case information; ability to represent program in oral and written form. *Minimum Education and Experience* —Graduation from high school plus four and one half years of experience in investigative, judiciary, eligibility, attorney's office or related work which provides the knowledges, skills and abilities needed to perform the work, including one year of IV–D experience; or four year degree plus one and one half years of experience in the Child Support Enforcement Program; or Associate of Arts Degree in business, human resources, law enforcement or closely related field and two and one half years of experience in investigative, judiciary, eligibility, attorney's office or related work, including one year of IV–D experience.

Plaintiff's Exhibit 4.

(6) Jean P. Bost, the white Child Support Supervisor IV and Director of the Mecklenburg and Union County offices of the Agency, was responsible for screening and interviewing applicants for the promotion and for determining which applicant should receive the position of Supervisor I. Bost indicated on Plaintiff's Exhibit 9 (Defendant's Affirmative Action Program Report of Applicant Selection/Rejection Data) that the selection criteria which she used for choosing a candidate to fill the position of Supervisor I were: merit system education and experience requirements, good attitude

toward others, and ability to make decisions and evaluate.

(7) Ms. Best testified as a hostile witness that she had worked with all of the applicants for years and had supervised directly all but one of the applicants. She further testified that she had had a very close relationship with their supervisors and had a lot of background about their knowledge and abilities prior to her interviews with them. Ms. Best credibly testified, however, that she did not make a tentative selection of the successful candidate until after she interviewed the applicants.

(8) The Plaintiff testified that her interview with Ms. Best lasted approximately five minutes. She further stated that Ms. Best asked her only two questions, to wit, whether she had any previous supervisory experience and what she considered to be the hardest part of the supervisory job. She maintained that she was not asked the questions on Plaintiff's Exhibit 5, page 2 (Ms. Best's interview evaluation sheet for the Plaintiff) regarding any weaknesses she needed to strengthen to perform the job, the skills she believed the job required, whether she thought she had those skills, her ability to evaluate and determine trends and to appropriately represent them, or how her education and experience related to this job. The Plaintiff admitted that she did not initiate any discussion with Ms. Best, but merely answered the questions by saying that she had no supervisory experience and that supervising former co-workers would be the hardest part of the job for her. Her only question of Ms. Best was whether "that was all."

(9) Ms. Best testified that she did ask the Plaintiff all the questions on the interview evaluation sheet. She noted that the Plaintiff was very short with her answers and was generally cool in her attitude at the interview, as if she did not wish to be there. Best explained that recorded responses appear after only two of the questions because there was not enough time between the Plaintiff's answers to write anything down. She further explained that the fact that there are no written responses next to certain questions does not mean she did not ask them, since her notation of responses was more a matter of "doodling" on her part than a matter of detailed recordation. The Court concludes that the Plaintiff has failed to show by a preponderance of the evidence that Ms. Best did not ask her all the questions that appear on Plaintiff's Exhibit 5.

(10) Harriet Grier, a black female applicant, testified that she interviewed with Ms. Best for approximately ten minutes. Klydette Lowery, another black female applicant who was not selected for the subject promotion but who was subsequently promoted when another Supervisor I position opened, testified that she interviewed with Ms. Best for approximately twenty minutes. Victoria Lipscomb, the successful white female applicant, testified that she interviewed with Ms. Best for approximately forty-five minutes to one hour. The testimony of Otis Worthy, the black male applicant for the position, corroborated Ms. Lipscomb's estimation of the length of her interview. No evidence was presented as to the duration of Mr. Worthy's interview or the interview of the other white female applicant.

(11) After the interviews, Ms. Best formed a tentative opinion that Victoria Lipscomb was the strongest candidate for the position. She testified that to be sure, she thoroughly considered the performance criteria listed on Plaintiff's Exhibit 5, page 1, which she considered important to success in the Supervisor I position, and assigned point scores ranging from a low of one to a high of five to those criteria with respect to each applicant.[2] The point totals

2. The criteria listed on Plaintiff's Exhibit 5 along with the numerical values assigned by Best to Lipscomb and the Plaintiff are as follows:

| | LIPSCOMB | AUTRY |
|---|---|---|
| Ability to work independently | 4 | 2 |
| Decision making and judgments | 5 | 4 |
| Teamwork-attitude toward others | 5 | 3 |

| | LIPSCOMB | AUTRY |
|---|---|---|
| Ability to represent program in oral and written form | 5 | 4 |
| Interview | 4 | 4 |
| Experience and education | 4 | 4 |
| Thorough knowledge of IV–D program, related legal, judicial aspects | 5 | 4 |

confirmed Ms. Bost's tentative opinion, and she decided that Lipscomb should receive the promotion. She stated that the interview itself was a consideration but that it did not play a major role in her selection of the successful candidate or carry as much weight as other considerations.

(12) Ms. Bost posted a notice of the selection of Lipscomb for the promotion on August 2, 1983.

(13) On August 9, 1983, the Plaintiff filed a charge of discrimination against the Defendant with the EEOC, alleging a racially motivated failure to promote. She received a right-to-sue letter from the EEOC on December 12, 1984.

(14) The Plaintiff claims that Ms. Lipscomb was not as qualified as she was for the promotion but was promoted because she was a friend of Ms. Bost and because her mother had connections with state officials.

(15) The Plaintiff attempted to establish that Lipscomb was less qualified than she in four ways. First, she pointed out the difference in their levels of education. While the Plaintiff had earned a B.A. degree, Ms. Lipscomb's employment application indicates that she spent only two years in college and did not receive a college degree. *See* Plaintiff's Exhibit 8.

(16) Second, the Plaintiff pointed out that she had more seniority in the position of Agent II than Lipscomb by at least two years. At the time they applied with Ms. Bost for the promotion, the Plaintiff had worked as an Agent II for four and one-half years in the Agency's Union County office, where she worked alone with one clerk, and for one and one-half years in the Charlotte office, where there were approxi-

mately thirty employees; Ms. Lipscomb had worked as an Agent II in the Charlotte office for almost four years. The Court notes, however, that Ms. Lipscomb had also accumulated over one and one-half years of investigatory experience in her prior job as an Employment Specialist for Employment Practices Association from 1976 to 1978. *See* Plaintiff's Exhibit 8.

(17) More importantly, while it is true that the Plaintiff had more seniority as an Agent II than Ms. Lipscomb, the Court notes that Ms. Lipscomb had more supervisory experience than the Plaintiff. Ms. Lipscomb's application for the Supervisor I position reveals that she supervised several employees in researching and evaluating personnel files, employment records, and affirmative action plans when she worked as an Employment Specialist. The Plaintiff, on the other hand, testified that she told Ms. Bost during her interview that she had no supervisory experience.

(18) The third way in which the Plaintiff attempted to show that Ms. Lipscomb was less qualified for the promotion was through the presentation of testimony from a number of workers at the Agency in Charlotte that Ms. Lipscomb had a reputation for often being away from her desk [3] and from Ms. Lipscomb's supervisor that she had counselled her in April 1983 about being away from her desk. The Plaintiff testified that she, on the other hand, stayed at her desk at least five hours on days when she was not in court and at least four hours on days when she was in court.

(19) The Plaintiff testified that an Agent II needed to be at his or her desk to do casework, to make and receive phone calls, and to complete legal forms. The Court

| | LIPSCOMB | AUTRY |
|---|---|---|
| Office management practices and procedures | 4 | 3 |
| Working knowledge of supervisory practices and management techniques | 4 | 3 |
| Skill in interviewing and investigation | 4 | 4 |
| Ability to organize and summarize case information | 4 | 4 |
| | 48 | 39 |

**3.** The Court sustained the Defendant's objection to the Plaintiff's line of questioning regarding the amount of time Ms. Lipscomb spent away from her desk as being irrelevant to the issues in this case. The Court allowed the Plaintiff to introduce such testimony for the record, however. The Court will discuss the Plaintiff's evidence on this point out of an abundance of caution to show that the Plaintiff's evidence was insufficient to withstand the Defendant's 41(b) Motion with or without the admission of this testimony.

notes, however, that perpetual desksitting was not a prerequisite to the position of Supervisor I and finds it doubtful whether it is determinative of success or failure in the performance of an Agent II's job. Indeed, further testimony from the Plaintiff and other Agent IIs at the Agency in Charlotte revealed that it was not possible for the Plaintiff, Lipscomb, and the other Agent IIs whose desks were on the first floor to remain at their desks constantly and perform all of their duties. At the time in question, the case files, reference books, AFDC logs, city directory, child support payment records, and copier were all on the second floor. In addition, some cross-reference records were kept in some of the offices on the second floor in which other Agent IIs worked. The Plaintiff admitted that the Agent IIs on the first floor had to go upstairs to do research (*e.g.*, to locate missing parents); to conduct interviews with parents, since the Agent would need to have access to the official case file; or to add information to a client's file. It is also apparent that Agent IIs would have had to go to the second floor to make copies of documents or to do cross-referencing work from records kept in Agents' offices on the second floor.

(20) Ms. Lipscomb testified that she recalled that there were often times she had to be away from her desk because of activity generated on her caseload and that she would often stop and talk to people she saw en route. She stated that Pauline Shoemaker, her supervisor, told her once that her coffee break in the morning was too long, but that she could not recall any other comments being made to her on the subject.

(21) The Plaintiff testified that Ms. Bost made a remark to her in early May 1983 that she did not see how Ms. Lipscomb got her work done while being away from her desk, but that she guessed that she did. Mike Culp, another Agent II in Charlotte, testified that he remembered Bost mentioning that she did not see how Ms. Lipscomb got her work done but that she did get it done.

(22) The Plaintiff also claims Ms. Lipscomb was less qualified because she had a bad attitude about doing her work. Ms. Lipscomb testified that she had talked to people in the office in 1983 about suffering from job burnout as a result of having a very frustrating job as an Agent II. Ms. Lowery testified that Ms. Lipscomb had commented to her that she had lots of work to do, that she hated to do it, but that she guessed she had to do it. The Plaintiff testified that Ms. Lipscomb had mentioned to her that she was suffering from burnout and had joked that someone needed to chain her down to get her started on her work.

(23) Finally, the Plaintiff attempted to show through the testimony of Elizabeth Watkins, who was promoted to Agent II in July 1983 to fill the position vacated by Ms. Lipscomb, that Ms. Lipscomb's files were in disarray and were not up-to-date at the time of her promotion. Ms. Watkins testified that when she began working on and reviewing the caseload that Ms. Lipscomb had turned over to her, she discovered actions that had been initiated but not completed, filings that had not been done, and various other problems which she reported to her supervisor, Archie Haywood.

(24) Archie Haywood, who is black, testified that there were matters in Ms. Lipscomb's former caseload that had not been done which should have been done, but that there were no more problems in her caseload than was normal. He explained that the job makeup of the Agent II position dictates that the caseload cannot be kept current at all times. He further stated that the problems Ms. Watkins brought to his attention were not major problems and that the state of Ms. Lipscomb's caseload was similar to that of most of the other Agent II caseloads in the Agency.

(25) Having reviewed the evidence that the Plaintiff presented in an attempt to show that Lipscomb was less qualified than she for the Supervisor I position, the Court finds that she has failed to establish by a preponderance of the evidence (1) that Ms. Lipscomb was not qualified for the job, or (2) that the Plaintiff was more qualified for the job as a result of her more constant

desk-sitting, higher level of education, or longer experience as an Agent II. While it is true that the Plaintiff had more education and more experience within the Agency, Ms. Lipscomb's credentials satisfied the education and experience requirements for the Supervisor I position. Further, nothing the Plaintiff presented shows that Lipscomb was not qualified or was less qualified than the Plaintiff with respect to the other selection criteria noted on the Defendant's Report of Applicant Selection/Rejection Data (*i.e.*, good attitude toward others and ability to make decisions and evaluate). *See* Plaintiff's Exhibit 9.

(26) The Plaintiff claims that Ms. Bost disregarded the relative qualifications of the applicants and decided to promote Ms. Lipscomb solely on the basis of her friendship with Lipscomb and the connections Lipscomb's mother allegedly had with state officials.[4]

(27) Ms. Lipscomb acknowledged that she and Ms. Bost were friendly to each other and that they went out to lunch a couple of times a month when she was an Agent II, usually with a group but sometimes alone. Ms. Bost testified that she did not remember going to lunch with Lipscomb as frequently as twice a month, but did state that she went to lunch with her on occasion.

(28) Otis Worthy testified that when he saw Ms. Lipscomb after her interview, she told him that she thought her interview had been "pretty good," that she thought she had gotten the job, and that "it's not what you know, it's who you know." Ms. Lipscomb testified that she had no recollection of making the comment "it's not what you know, it's who you know," in July 1983. She stated that that was a cliche she has often heard and that she has probably said it at some point. She did not remember, however, saying it to anyone in particular with any particular intent. Lipscomb further testified that she has never said that

her mother could help her in obtaining employment and promotions within the State bureaucracy.

(29) The Plaintiff called Robert Mathes, the State Personnel Analyst III who investigated the charge of discrimination filed by the Plaintiff with the Office of State Personnel against the Agency, as a witness in an attempt to show that his supervisor ordered him to alter the findings of his investigation after he saw Mathes' report concluding that the Defendant had discriminated against the Plaintiff. Mathes testified, however, that no one at the Office of State Personnel directed him to change his report. He explained on cross examination that his supervisor, who was a law school graduate, merely told him that his findings of fact did not support his conclusion of law that the Plaintiff was discriminated against when Bost chose Lipscomb instead of her for the promotion. Mathes further testified that after the discussion with his supervisor, he attempted to rewrite his report so that the findings would support his legal conclusion of discrimination, but ultimately decided that his conclusion could not be supported by the findings of his investigation.

(30) The Plaintiff relied on two incidents that occurred months after the promotion incident to support her claim of a racially biased atmosphere. In December 1983, the Plaintiff's white supervisor, Pauline Shoemaker, told a joke to the Plaintiff which turned on the word "colored." In January 1984, an Agency employee repeated a racial joke to the Plaintiff which had been told by another co-worker the previous day when the Plaintiff was not at work.

(31) Ms. Shoemaker testified that she apologized to the Plaintiff for having told the December 1983 joke when the Plaintiff complained to her about it in January 1984. She expressed true regret at the trial for having told what she described as an "inap-

---

**4.** As with the Plaintiff's questioning regarding Ms. Lipscomb's presence at or absence from her desk, the Court sustained the Defendant's objection to the admissibility of evidence regarding Lipscomb's mother's connections with state officials. The Court let the Plaintiff put the evi-

dence on the record, and the Court will discuss it presently to show that it would not have affected the Court's opinion that the Plaintiff has not sustained her burden of proving a *prima facie* case of discrimination.

propriate joke and remark." After the Plaintiff complained to her about the joke that was repeated to her in January 1984, Shoemaker warned the original joke-teller that she did not want to hear any comments about any racial matters or minorities in the office ever again.

(32) The Plaintiff filed a charge against the Defendant with the EEOC on April 13, 1984, alleging retaliation and maintenance of a racially biased atmosphere. She received a right-to-sue letter for this charge on July 19, 1985.

(33) The Plaintiff presented no evidence that would tend to show that the Defendant treated her adversely after it discovered that she had filed a charge of discrimination against it with the EEOC.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction over this litigation pursuant to 28 U.S.C. § 1343.

(2) The Defendant is subject to the jurisdiction of this Court and is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

(3) Title VII of the Civil Rights Act of 1964 provides in pertinent part:

It shall be an unlawful employment practice for an employer—

(1) to fail ... to hire ... any individual, or otherwise to discriminate against any individual with respect to his ... conditions ... of employment, *because of such individual's race* ....

42 U.S.C. § 2000e–2(a)(1) (emphasis added). Accordingly, the burden is on the Plaintiff to prove by a preponderance of the evidence that the Defendant intentionally failed to promote her *because* she was black, not that it failed to promote her *and* she was black. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

(4) In Title VII cases of disparate treatment, such as the instant action, the Plaintiff may establish a *prima facie* case in one of two ways. First, she may present "direct evidence of discrimination or ... indirect evidence whose cumulative probative force ... would suffice under the controlling standard to support as a reasonable probability the inference that but for the Plaintiff's race he would have been promoted." *Holmes v. Bevilacqua*, 794 F.2d 142, 146 (4th Cir.1986) (citing *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 242 (4th Cir.1982)).

■ (5) The Court is of the opinion that the Plaintiff has presented neither direct evidence of racial discrimination nor indirect evidence whose cumulative probative force supports as a reasonable probability the inference that race was a determining factor in Ms. Bost's decision not to promote her. The Court found above that the Plaintiff failed to establish that Lipscomb was not qualified or that she was not as qualified as the Plaintiff for the promotion. Nonetheless, the Plaintiff argues that the cumulative probative force of her evidence supports the inference that Ms. Bost, the white director of the program, promoted Ms. Lipscomb, also a white person, because of their friendship and because of her mother's connections with state officials, not because of her qualifications. She argues in turn that

[w]hen friendship is used as a basis for promotion, and the promoting person is white, a [sic] inference of racial discrimination is raised since, in our society, white persons are much more likely to have white friends than friends of other races. Thus, race enters into a subjective selection procedure. When a person can make a comment such as that made by Lipscomb that "It's not what you know, but who you know," it destroys an objective promotion system. It also remains true in our society that white persons know officials who are higher up in government than black persons.

Plaintiff's Trial Brief in the Form of Proposed Findings of Fact and Conclusions of Law, Proposed Finding of Fact # 12.

■ (6) While the Plaintiff's theory is quite novel, it fails to satisfy the Court that it is more likely than not that Bost would

have promoted the Plaintiff instead of Lipscomb but for the fact that the Plaintiff was black. The Court grants the Plaintiff that there is too much hiring and promoting on the basis of who knows whom and who is friends with whom. Such an insidious practice should never decide who will get a job. Nonetheless, while the Court agrees that promotions should be based purely on a person's qualifications, the law unfortunately does not prohibit employment practices based on friendship or politics, but only those based on race.

■ (7) The two racial jokes the Plaintiff testified were told to her were related long after the promotion process was completed and did not involve the supervisor controlling the decision to promote Lipscomb instead of the Plaintiff. Therefore, such evidence is not probative of any discriminatory intent on the part of Bost in her failure to promote the Plaintiff. *See Lilly v. Harris-Teeter Supermarket*, 720 F.2d 326, 338 (4th Cir.1983), *cert. denied*, 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 539 (1984); *McCann v. Delaware River Port Authority*, 548 F.Supp. 1206, 1214 (E.D.Penn.1982) (Title VII not violated when foreman who made racial slurs had no input into employment decision affecting plaintiff), *aff'd*, 725 F.2d 669 (3rd Cir.1983).

(8) Without direct or indirect evidence of discrimination, the Plaintiff must resort to the *McDonnell Douglas* proof scheme to establish a *prima facie* case. *Holmes v. Bevilacqua, supra*, 794 F.2d at 146. To establish a *prima facie* case of disparate treatment under that proof scheme, the Plaintiff must prove (1) that she belongs to a racial minority; (2) that she applied and was qualified for the position for which the Defendant was seeking applicants; (3) that, despite her qualifications, the Defendant rejected her; and (4) that, after her rejection, the position remained open and the employer continued to seek applicants of the Plaintiff's qualifications. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

(9) There is no question that the Plaintiff's evidence shows that she is black, that she applied for and was qualified for the Supervisor I position, and that she was rejected despite her qualifications. Because Lipscomb was selected at the same time the Plaintiff was rejected, however, the Plaintiff cannot prove that the position remained open after her rejection and the Defendant continued to seek applicants of her qualifications.

(10) The Fourth Circuit stated in *Holmes, supra*, 794 F.2d at 146, that "leaving the job open is the element that justifies the presumption of racial discrimination and makes a *prima facie* case" under the *McDonnell Douglas* proof scheme. The Court explained that "[b]y not hiring a qualified black and continuing to search for a qualified person other than a black, the employer has acted in such a way as to justify the presumption of discrimination and to require such employer to explain his action." *Id.* The black plaintiff in *Holmes*, like the Plaintiff in the present case, was one of five applicants who were found to be qualified in the screening process. The promotion of the successful white candidate in *Holmes* was simultaneous with the rejection of the plaintiff and the other three qualified applicants.

(11) The Fourth Circuit in *Holmes* held that the four-prong proof scheme of *McDonnell Douglas* is applicable in the factual situation in which one of several qualified employees is promoted, at which time the vacancy ceases. *Id.* at 147. The Court further held that

since the plaintiff [in such a situation] cannot prove that the vacancy remained open after he was rejected, he must present some other evidence that his race was a factor considered by his employer in not granting him the promotion. There must be some evidence that race was a determining factor in the employer's decision.

*Id.* The Court proceeded to note that the plaintiff in the case before it failed to present any direct evidence of discrimination or indirect evidence whose cumulative effect established that his employer was motivated by race. It concluded that "[w]ithout this element, the plaintiff did

not make out a *prima facie* case and is not entitled to the presumptions that would accompany such a case." *Id.*

(12) Likewise, this Court has already concluded that the Plaintiff has failed to present any direct evidence of discrimination or indirect evidence which taken cumulatively would give rise to a reasonable inference of intentional racial discrimination against the Plaintiff by Bost. Since the Plaintiff has not shown any evidence that her race was a factor considered by Bost in not granting her the promotion, she has failed to make out a *prima facie* case of racial discrimination under the *McDonnell Douglas* proof scheme as applied by the Fourth Circuit in *Holmes.*

■ (13) The only evidence that the Plaintiff presented to support her claim that the Defendant maintains a racially biased work atmosphere was the two jokes related to her in December 1983 and January 1984. While maintenance of a racially biased atmosphere can constitute a violation of Title VII, "casual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of action." *Bundy v. Jackson,* 641 F.2d 934, 943 n. 9 (D.C.Cir. 1981). The two racial jokes the Plaintiff testifies were told at work by her supervisor and a co-worker hardly qualify as more than casual or isolated incidents. The testimony of Plaintiff's supervisor, Pauline Shoemaker, shows that she deeply regretted having made such an "inappropriate remark" and that she warned the employee who told the other racial joke that such remarks would not be tolerated. This evidence rebuts the Plaintiff's contention that those two jokes are clear evidence of a racially biased work atmosphere.

■ (14) Finally, the Court concludes that the Plaintiff's evidence is insufficient to make out a *prima facie* case of retaliation. Section 2000e–3(a) of Title 42 provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

To establish a *prima facie* case of retaliation, an employee must establish three elements by a preponderance of the evidence:

1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a causal connection existed between the protected activity and the adverse action.

*Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985) (citations omitted). The Plaintiff certainly showed that she engaged in a protected activity when she filed a charge of discriminatory failure to promote against the Defendant with the EEOC. She did not, however, show by a preponderance of the evidence that the Defendant took any adverse employment action against her after she filed her charge. Consequently, she cannot possibly establish the requisite causal link between her protected activity and an adverse employment action.

(15) Any finding of fact which is determined also to be a conclusion of law is so deemed, and any conclusion of law which is determined also to be a finding of fact is so deemed.

Based on the foregoing Findings of Fact and Conclusions of Law, IT IS, HEREBY, ORDERED that:

(1) This action is *DISMISSED WITH PREJUDICE* pursuant to Rule 41(b) of the Federal Rules of Civil Procedure;

(2) The parties shall pay their own costs, including attorney's fees; and

(3) Judgment will be entered in accordance with this Memorandum of Decision.