Robert J. **NESMITH**, Plaintiff,

v.

**MARTIN MARIETTA AEROSPACE**, a corporation d/b/a **Martin Marietta Aerospace, Orlando, Florida,** Defendant.

Nos. 85–951–CIV–ORL–18, 85–1001–CIV–ORL–18.

United States District Court, M.D. Florida, Orlando Division.

Feb. 6, 1987.

Robert J. Nesmith, pro se.

Thomas C. Garwood, Garwood & McKenna, P.A., Orlando, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE KENDALL SHARP, District Judge.

This consolidated action, alleging racial and retaliatory discrimination, was tried before the court without a jury. The parties stipulated that damages would be bifurcated and deferred until the court determined liability. At the end of plaintiff's case, the court granted defendant's motion for involuntary dismissal under Federal Rule of Civil Procedure 41(b) and awarded defendant costs and attorneys fees. Based upon facts concerning plaintiff's employment with defendant, admitted by the parties in their joint pre-trial stipulation, and the testimony and exhibits admitted at trial, the court enters the following findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 41(b) and 52(a).

## FINDINGS OF FACT

Black plaintiff Robert J. Nesmith, who holds a bachelor of science degree, was employed as a senior manufacturing engineer by defendant Martin Marietta Aerospace in Orlando, Florida, on September 9, 1974. He entered as labor grade 45 at a salary of $14,950.00. Because of a governmental program cancellation and consequent, stringent layoffs by defendant, a government contractor, some former employees blamed plaintiff for losing their jobs. (Trial Transcript (hereinafter "Tr.") at 205).

In approximately 1975, plaintiff's boss requested that he represent the manufacturing department on the Equal Employment Opportunity (EEO) Committee. In this capacity, plaintiff sought to rectify the non-promotion of blacks in the manufacturing department. He was instrumental in

establishing successful training programs for the benefit of blacks and females.

In October, 1975, plaintiff was transferred to the electrical engineering department, and he was given a salary merit increase to $15,860.00. Subsequently, he and other individuals began a training program to prepare them for another move pursuant to the EEO program. Plaintiff testified, "At the time, I was a 45 labor grade and I thought that was super." (Tr. at 211).

Plaintiff's stipulated employment record shows that he had a leave of absence with pay from November 10–24, 1975; a department transfer in May, 197[6]; a merit salary increase in October, 1976 to $16,900.00; and a class change to senior engineer in April, 1977. In May, 1977, the EEO committee appointed plaintiff as spokesperson to management regarding an employee, who had left the company and had not received his final paycheck. In the absence of two other management individuals, plaintiff left a message for Robert Whalen, vice president and general manager of the manufacturing division, that he "was aware of a very serious problem, potential repercussions to the company that would be negative," that he "didn't want to discuss the problem with anybody else," and that the problem "was something he should know about." (Tr. at 218).

A conference between Whalen and plaintiff ensued, wherein plaintiff discussed not only the subject individual, but also Martin Marietta minority problems, including the lack of promotions. As a result of this awareness, Whalen established a grievance committee to give minorities an opportunity to meet with him and to air their grievances. Whalen, who viewed these meetings positively, subsequently became president of Martin Marietta.

In July, 1977, plaintiff was promoted to marketing representative under Bill Ammon, deceased, director of systems analysis, and he was upgraded to labor grade 47 and to a salary of $20,020.00. From July, 1977, until October, 1980, plaintiff received two department transfers, three merit salary increases, and two salary rate adjustments, culminating in a salary of $29,302.00. In 1978, Ben Morall, Jr., a black, the former EEO administrator at Bendix Corporation Launch Support Division for four years, was hired as the EEO administrator for Martin Marietta Aerospace. As plaintiff continued to progress in the systems analysis area, he felt that Morall was developing negative opinions regarding plaintiff's meetings and relationship with Whalen.

Morall testified that he was suspicious of plaintiff's rise within the company and of plaintiff's promotion to grade 47 because plaintiff did not merit this middle-professional rating. Morall believed that plaintiff lacked experience and qualifications and that Whalen was giving plaintiff preferential treatment, which explained positive ratings from plaintiff's supervisors. (Tr. at 53–54, 122). Furthermore, Ammon told Morall that plaintiff was not doing the job, that he did not understand the work, and that he kept plaintiff because of Whalen. (Tr. at 77, 80).

In October, 1980, plaintiff was promoted within the systems analysis division to labor grade 49 at a salary of $31,200.00. Plaintiff attributes this promotion to his bringing four-star General Volney Warner to Martin Marietta in June, 1980, in connection with plaintiff's responsibilities for impacting the rapid deployment forces community. Morall testified that plaintiff was promoted "too many times too fast" and that this was "unfair to the other people." (Tr. at 83). Despite plaintiff's appraisals, Morall regarded plaintiff's promotion to grade 49 as the result of "affirmative consideration," which he defined as the company president telling a person reporting directly to him to see that plaintiff succeeded. (Tr. at 84).

Interestingly, plaintiff explained "the Martin Marietta system" concerning labor grades in the following manner:

> ... labor grades mean nothing at Martin. They place you and let you do any, assign you to whatever task they want. A labor grade is just the tool to use. They have overlapping in salary ranks that runs from labor grade 41 down to labor

grade 49, so you can essentially be a 41 and make more money than a 49. Your experience or your capabilities is not indicated by your labor grade. (Tr. at 229).

Following plaintiff's promotion to labor grade 49, an employee was fired and "the blacks got into an uprising" and wanted to send "a very bad letter to corporate about Mr. Whalen." (Tr. at 232). Plaintiff contacted Whalen, who was away on a trip, and plaintiff testified that he was instrumental in resolving the situation, for which Whalen was grateful. Subsequently, the entire systems analysis department was transferred to the CNA building and placed on Whalen's staff. In late 1980, plaintiff considered himself "the company R.D.F. [rapid deployment forces] expert" and Ammon's "personal problem solver." (Tr. at 234). From October, 1980, until October, 1983, plaintiff received four transfers, two salary merit increases, and one salary rate adjustment, culminating in a salary of $38,220.00.

Plaintiff's aspirations for company advancement included entering the Martin Marietta business marketing division, which he requested approximately the first of 1982. Plaintiff told Ammon that his goal was to be "at least vice president of the company" in five or ten years. (Tr. at 246). The personnel department previously had informed plaintiff that a masters degree in business administration (M.B.A.) was a prerequisite for the marketing department. Therefore, plaintiff had utilized defendant's reimbursement program and obtained an M.B.A. from Florida Institute of Technology in July, 1982. He also acquired a real estate salesman's license in 1980, and a real estate broker's license in 1983. Morall testified that his investigation of plaintiff revealed that plaintiff was spending time and energy on studying and selling real estate rather than on his job with defendant. (Tr. at 63, 65).

In 1982, when plaintiff learned of efforts to place him in the marketing department by displacing his white friend there, plaintiff specifically told Ammon that "under no circumstances" would plaintiff be transferred to marketing at the expense of his friend. (Tr. at 248). Plaintiff thought that his salary was low in comparison with his peers and requested management to do an analysis. The report showed no discrepancies. (Tr. at 245). Also in 1982, Ammon gave plaintiff an average rating, which he did not understand. *Id.*

Early in 1982, plaintiff realized that Whalen was experiencing difficulties as company president. Approximately May, 1982, Whalen left defendant and plaintiff testified that Whalen was "extremely upset" when he talked to him before his departure. (Tr. at 251). In late November, 1982, the systems analysis department returned to defendant's main plant. Plaintiff testified that, following the transfer back to defendant's main plant, his assignments and travel ceased and, that, for the remainder of 1982, he was left in his office "begging for assignments" and awaiting transfer to marketing. *Id.*

While plaintiff testified that he was transferred into the marketing department under Frank Oles, director of marketing, in February, 1983, his stipulated employment record reflects this change in October, 1983. Plaintiff testified that his efforts in the marketing department appeared to be thwarted. Yet, plaintiff received a merit salary increase to $40,898.00 in November, 1983.

Bud Cranford, deputy director of marketing research, informed Morall that plaintiff was "coming up short" and did not comprehend his work. (Tr. at 74). In a group appraisal of his work, plaintiff admitted that Cranford criticized his failure to effectively interface with lower-level engineers and his failure to properly prepare a weekly marketing report. (Tr. at 257). Nevertheless, plaintiff complained that he did not have sufficient work and that he was getting no responses from supervisors. After talking with management, plaintiff began to consider filing suit against defendant because of his low salary and the lack of a formal evaluation for two years.

In approximately late January, 1984, the year in which plaintiff filed racial and retaliatory EEO charges, plaintiff "learned

through his supervisor that Freddie Marion, vice president of marketing, had stated in a marketing meeting, which plaintiff did not attend, that he did not want "that blankety blank in my department and nobody is going to force him on me." (Tr. at 266). The court does not credit this hearsay or any other hearsay attempt by plaintiff as evidence of direct racial discrimination against plaintiff. When plaintiff contacted the personnel department regarding his situation, he was told that the reason that he was not receiving assignments was that personnel had informed marketing that they were uncertain as to what to do with him. *Id.* Specifically, the administration succeeding Whalen did not consider plaintiff a team player and did not condone his attempting to talk to defendant's president, which was against company policy. (Tr. at 267). Plaintiff was informed that Ammon had agreed to take him back in the systems analysis area.

When plaintiff returned to systems analysis in January, 1984, at labor grade 49 and a salary of $40,898.00, a suitable position had to be found for him. Plaintiff and Ammon agreed that marketing, or interfacing with customers, was the better department for him. Plaintiff admitted that Ammon told him that marketing was better for him than systems analysis because "I wouldn't have to compete with the younger, quicker analytical types and [sic] the systems analysis area and I could use my analysis capability with not having to worry about the technical requirements of systems analysis." (Tr. at 270).

Plaintiff testified that, as in marketing, he received few or no assignments and that his lack of work continued through the end of November, 1984, when he began having severe headaches. (Tr. at 272). Following his return to systems analysis, plaintiff had paid medical absences from July 3–11, 1984, and October 26–30, 1984. Plaintiff's family doctor had diagnosed his condition as "Martinitis" or psychological, job-related stress and not a physical condition. *Id.*

Plaintiff's doctor convinced him to see a psychiatrist, although plaintiff believed that this would cost him his technical career with top secret clearance and "would give Martin additional ammunition to discriminate against me." (Tr. at 272–73). The treating psychiatrist, who first saw plaintiff on November 21, 1984, testified that plaintiff appeared "very depressed," "tearful," and "quite anxious." (Tr. at 4). The psychiatrist also attributed plaintiff's condition to job-related stress. Not only did the psychiatrist inform plaintiff that his situation at Martin "was entirely too much" for him, but also that he might die, harm himself or others if he did not quit. (Tr. at 273). Refusing to believe that his problems were psychological, plaintiff told the psychiatrist: "I've never ever thought about harming myself.... I was totally in love with myself." *Id.*

The psychiatrist placed plaintiff on medical leave, which, because of two extensions lasted from December 4, 1984 through March 1, 1985. Against his psychiatrist's advice, plaintiff returned to work in systems analysis March 1, 1985 on antidepressant medication. Plaintiff testified that, after several months with no assignments, his headaches became exacerbated. (Tr. at 276).

In early June, 1985, plaintiff was called into a meeting in Ammon's office which included Ammon, Morall and Roy Heglmeier, director of human resources. Plaintiff was informed that his supervisor and others concerned with his situation concurred that he could return to manufacturing engineering or be terminated. Morall testified that Ammon had complained that plaintiff could not perform the work he needed and that he was exceeding his budget because of plaintiff. (Tr. at 130). Morall stated that management decided that, since plaintiff had problems in other areas, he might do well in the manufacturing division, his original department. (Tr. at 130–31). Plaintiff, however, interpreted management's decision as their attempt to have him fail because he did not have the expertise of manufacturing labor grade 49 personnel. Indeed, plaintiff considered the proposed return to manufacturing harassment. (Tr. at 280).

The following day, Heglmeier told plaintiff that, if he decided not to take the manufacturing position, then defendant would give him all severance, vacation and profit sharing payments and facilitate his starting a new career. *Id.* He then told plaintiff to take some time off to consider his decision. A co-worker friend testified that plaintiff, in a distressed state, called him during the work day and asked him to drive plaintiff to the doctor and home. Plaintiff insisted that the co-worker take his letter of medical leave directly to defendant's president. On cross-examination, the co-worker testified that medical releases usually were taken to the medical department. (Tr. at 194).

Commencing June 19, 1985, plaintiff took a paid medical leave of absence, which included hospitalization. This medical leave consisted of six extensions and six continuous months away from work at labor grade 49 and a salary of $40,898.00. On December 2, 1985, Heglmeier informed plaintiff by telegram that, in accordance with company policy, he would be removed from the corporate payroll after six months of medical leave of absence. (Plaintiff's Exhibit 24). Plaintiff was terminated, effective December 19, 1985, for "Medical LOA—Long term disability pending." (Plaintiff's Exhibit 14). The day plaintiff checked out of defendant's plant, he entered law school, where he has been since his termination. (Tr. at 282).

In this action, plaintiff contends that he met and exceeded his various job assignments and that defendant racially discriminated against him with respect to salary and assignments, particularly, in the marketing department. He further alleges that defendant retaliated against him because of his EEO charges. Defendant counters that plaintiff's failure to progress further in his assignments were the result of his own capabilities and limitations and that rather than retaliate, defendant made every effort to accommodate plaintiff. Of approximately 14,000 employees, defendant has in excess of fifty to seventy-five black executives in the 49 to 50 labor grade. (Tr. at 144).

Defendant contends that plaintiff's promotions to 47 and 49 labor grades were the result of affirmative considerations and not merit, and, consequently, plaintiff had to earn credibility and respect. Defendant also argues that, by this action, plaintiff is attempting to use the government to achieve an undeserved status, which would undermine the purpose of affirmative action. Furthermore, plaintiff's other activities, such as obtaining an M.B.A., two real estate licenses, and his concern with others' jobs, salaries and promotions deterred him from concentrated work on his assignments and proving his ability to handle positions that he sought.

It is defendant's position that plaintiff was overpaid and over-promoted and that to promote him further would have discriminated against qualified employees, irrespective of race, who had earned their positions as documented by their performance and experience records. Plaintiff's placement in training programs and in different departments was defendant's effort to provide him the expertise to enable him to perform at his labor grade; plaintiff failed to appropriately utilize these opportunities. (Plaintiff's Exhibits 1 and 2).

## CONCLUSIONS OF LAW

The court has jurisdiction of this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* the Civil Rights Act of 1866, 42 U.S.C. § 1981; and 28 U.S.C. § 1331. Plaintiff has alleged racially motivated disparate treatment by defendant in his promotion, transfer, compensation, job assignments and performance appraisals. Additionally, he has alleged retaliation by defendant for his filing a charge of race discrimination in reassignment of position, denial of assignments, denial of salary increases, isolation in the workplace, and termination.

The parties correctly stipulate that the appropriate standard for analysis of this racial disparate treatment action derives from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450

U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See McCarthney v. Griffin–Spalding County Board of Education,* 791 F.2d 1549 (11th Cir.1986). Since the Eleventh Circuit has held that the same analysis for proving Title VII discriminatory intent may be used for proving 42 U.S.C. § 1981 purposeful discrimination in disparate treatment cases, the court will analyze plaintiff's claims under these sections concurrently. *Crawford v. Western Electric Co.,* 745 F.2d 1373, 1376 (11th Cir.1984); *Baldwin v. Birmingham Board of Education,* 648 F.2d 950, 954–55 (5th Cir. Unit B 1981). Because the court has discredited as hearsay plaintiff's attempt to show discriminatory motive by direct evidence, the *McDonnell Douglas* inference of discriminatory intent from circumstantial evidence is the applicable review standard. *Cf. Thompkins v. Morris Brown College,* 752 F.2d 558, 563 (11th Cir.1985); *Lewis v. Smith,* 731 F.2d 1535, 1538–39 (11th Cir.1984); *Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1556–57 (11th Cir.1983), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Lee v. Russell County Board of Education,* 684 F.2d 769, 774 (11th Cir.1982).

Under *McDonnell Douglas,* plaintiff must prove a prima facie case of unlawful discrimination by a preponderance of the evidence. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093. Once plaintiff has established a prima facie case, the burden shifts to defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. If defendant articulates such a reason, then plaintiff has the opportunity to prove that the defendant's reason was merely a pretext for its discriminatory action. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

■ In order to establish a prima facie case under *McDonnell Douglas,* plaintiff must show:

1) that he belongs to a racial minority;

2) that he applied and was qualified for a job for which the employer was seeking applicants;

3) that, despite his qualifications, he was rejected; and

4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *McCarthney,* 791 F.2d at 1551 n. 2; *see Perryman v. Johnson Products Co.,* 698 F.2d 1138, 1142 n. 7 (11th Cir.1983). Although plaintiff belongs to a protected racial group, the court is not convinced that he was qualified for the various positions and pay increases that he sought. Qualification is not only educational credentials and experience, but also the competence to perform the required task, encompassing an ability to cope with the consequent job pressure.

■ Plaintiff's supervisors testified that his performance in preparatory training programs in different departments showed that he was not able to handle the work or the job-related stress. Furthermore, plaintiff did receive his desired transfer into the business marketing department, which was once halted by him because he did not want to displace a white employee friend. Plaintiff's supervisors soon realized that he could not perform assignments commensurate with his salary and grade level. Plaintiff was given the job that he wanted, and he failed in it.

■ The court concludes that plaintiff has not established a prima facie case of disparate treatment because he has not met the second and third criteria for such a case. "Plaintiff has not presented direct or circumstantial evidence sufficient to support a finding of intentional discrimination." *Moore v. Devine,* 767 F.2d 1541, 1547 (11th Cir.1985), *modified on other grounds,* 780 F.2d 1559 (11th Cir.1986). It was evident from plaintiff's examination of Morall as a hostile witness that there was animosity between these individuals. However, "[p]ersonal animosity is not the equivalent of ... discrimination and is not proscribed by Title VII." *McCollum v. Bol-*

*ger,* 794 F.2d 602, 610 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 883, 93 L.Ed.2d 836 (1987); *see Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984).

▮ Plaintiff's burden, however, of establishing a prima facie disparate treatment case "is not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. Even if plaintiff had met his burden, the court concludes that defendant has shown legitimate, nondiscriminatory business reasons for its actions regarding plaintiff. First, testimony revealed that former company president Whalen was plaintiff's mentor. Plaintiff's promotions in labor grade, departmental transfers, and salary increases occurred after Whalen informed supervisors reporting to him that plaintiff should progress in the company. Notably, plaintiff's career thrived during the Whalen presidency and faltered with Whalen's departure. Plaintiff's alliance and access to Whalen also was misleading corporate procedure to others in plaintiff's labor grade. The court is convinced that Whalen's endorsement, and not plaintiff's abilities, explains plaintiff's career advancement with defendant.

Second, the court has determined that plaintiff did not have the requisite skills to handle the positions to which he was promoted at Whalen's instigation. His supervisors in both the systems analysis and marketing departments informed Morall that plaintiff was not capable of accomplishing projects equivalent to his labor grade and salary. This situation created a dilemma for the company because plaintiff's supervisors were reluctant to give him the responsibility that he should have been able to handle. As a result, plaintiff experienced periods with no assignments. Third, and consequently, the systems analysis and marketing departments were straining or exceeding their budgets in order to accommodate an essentially nonproductive employee at plaintiff's salary level.

Fourth, Morall's investigation of plaintiff revealed that he was selling real estate while at work for defendant. Plaintiff testified that he acquired two real estate licenses and a company-funded M.B.A. during his employment. Plaintiff's failure to give less than undivided attention to his job at his salary and labor grade was understandably a consideration in defendant's refusal to promote him further.

Fifth, during 1984–1985, plaintiff was on paid medical leave of absence at a salary of $40,898.00 for approximately nine and a half months. Plaintiff testified that his physicians advised him that his headaches were the result of job-related stress and that he should extract himself from defendant's employment. Plaintiff complains that he was not given work assignments, but defendant obviously was hesitant to give him projects when it could not rely on his being at work. Indeed, plaintiff's response to defendant's last attempt to find suitable work for him, transfer back to the manufacturing department, was to take a six-month medical leave of absence. Defendant's carrying plaintiff on its payroll for such an extended time was more than tolerant and, in fact, inequitable, considering the salary and medical benefits that it was outlaying to an unproductive employee.

Sixth, the court accepts defendant's contention that further advancement of plaintiff in any respect would be discriminatory to deserving, productive employees, the antithesis of affirmative action. Defendant did not lack blacks at management levels. The evidence showed that, if anything, plaintiff's progress with defendant was the result of preferential treatment. Plaintiff apparently wanted to progress another labor grade, although he testified that defendant's labor grades were meaningless. The facts that plaintiff's salary appeared low for his time at labor grade 49 and that he was not evaluated can be explained by his absence from work and his failure to statisfactorily perform assigned projects, resulting in no merit increases.

The Eleventh Circuit recently has reiterated the burden placed upon defendant once plaintiff has established a prima facie case where circumstantial evidence is used to prove discriminatory intent: "the employer need only articulate (not prove) a legitimate, nondiscriminatory reason for its

actions." *McCarthney*, 791 F.2d at 1553. The *McCarthney* plaintiff, in a sex discrimination action, surpassed other applicants in the educational, objective criteria for the sought promotional positions. She, however, lacked the subjective criteria, such as leadership and cooperation, which were crucial for the positions. In disparate treatment actions, sex and race discrimination are analyzed similarly under the *McDonnell Douglas* standards. The court concludes that defendant has articulated legitimate, nondiscriminatory reasons, based upon more than paper credentials, for its decision to progress plaintiff no further within the company.

■ Following defendant's articulation of legitimate, nondiscriminatory reasons for not further advancing plaintiff, the burden shifts back to plaintiff to prove that defendant's reasons were merely a pretext for its discriminatory action. Plaintiff's testimony revealed that he had an exalted opinion of himself and of his abilities and that he was told and shown by lack of assignments that his performance did not satisfy the requirements of projects for his labor grade. Plaintiff's unsubstantiated, conclusory assertions of race discrimination failed to meet his burden. The court concludes that plaintiff has not appropriately countered defendant's legitimate, nondiscriminatory reasons for its actions. Furthermore, since plaintiff failed to establish a prima facie case, he cannot prevail by showing that defendant's articulated reasons were a pretext. *Moore*, 767 F.2d at 1547; *Nix*, 738 F.2d at 1187.

Title 42 U.S.C § 2000e–3 makes it unlawful for an employer to discriminate or to retaliate against an employee because he has filed a charge of employment discrimination with the EEOC. Plaintiff filed charges of racial and retaliatory discrimination with the EEOC in 1984. During 1984 until his termination in December, 1985, plaintiff was classified as upper labor grade 49 and he was paid a salary of $40,-898.00. Also during this time period, plaintiff was absent from work on paid medical leave for approximately nine and a half months.

■ Nevertheless, plaintiff complains that, in retaliation for his charge of racial discrimination, he was denied departmental reassignment, projects, salary increases, and that he was isolated and, ultimately, terminated. Plaintiff may establish a case of retaliation discharge by proving that:

1) there was a statutorily protected participation,

2) an adverse employment action occurred, and

3) there was a causal link between the participation and the adverse employment action.

*McCollum*, 794 F.2d at 610; *Canino v. United States EEOC*, 707 F.2d 468, 471 (11th Cir.1983).

■ The court has discussed defendant's legitimate, nondiscriminatory reasons for stopping plaintiff's reassignment, salary increases, and projects in the context of plaintiff's racial discrimination charge. Given these nondiscriminatory reasons, defendant's not locating plaintiff with employees, who were present and productive in the workplace, is understandable. Plaintiff, however, interpreted this occurrence as isolation. After hearing the testimony, the court is persuaded that defendant was more than tolerant in attempting to give plaintiff assignments within different departments commensurate with his labor grade and salary, irrespective of his EEOC charges. Following the loss of his mentor Whalen, plaintiff showed that he simply was incapable of handling the work and job pressure.

■ Regarding the allegation of retaliatory discharge, the court reiterates that defendant was most tolerant with a virtually nonproductive employee at a high salary level in the pertinent time frame. Following his charges of racial and retaliatory discrimination in 1984, defendant paid plaintiff for 1985 when plaintiff was at work approximately three of twelve months. The court fails to see how plaintiff was disadvantaged.

Furthermore, rather than a causal connection between plaintiff's EEO charges and his discharge, the court accepts defend-

ant's nondiscriminatory, termination reason of medical leave of absence, following plaintiff's six-month paid medical leave, and pending long-term disability in accordance with company policy. "The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix* 738 F.2d at 1187 (citations omitted); *see Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1499 (11th Cir.1985). The court concludes that plaintiff has not proved retaliation discrimination.

In accordance with the court's analysis and discussion herein, the Rule 41(b) motion for involuntary dismissal by defendant was GRANTED at the close of plaintiff's case, judgment was entered for defendant, and the action was DISMISSED on the merits. There was no need for defendant to present its case because the court determined from the facts and applicable law that plaintiff did not experience race or retaliation discrimination.

■ The court's judgment also awarded defendant costs and attorneys' fees pursuant to Federal Rule of Civil Procedure 11. After reviewing the evidence, the court determined that this action was not well grounded in fact; that it was interposed for an improper purpose; and that the multi-day trial needlessly increased the cost of litigation. Fed.R.Civ.P. 11; *see Duncan v. Poythress*, 777 F.2d 1508, 1514 (11th Cir.1985), *cert. denied*, 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986). Additionally, the court concludes that this prevailing defendant is entitled to attorneys' fees under the standards of *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978) because plaintiff's action was "frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." 434 U.S. at 422, 98 S.Ct. at 701; *Duncan*, 777 F.2d at 1514.

■ In assessing costs and attorneys fees which will serve to deter the misuse of Title VII, the court also must consider the ability of plaintiff to pay. *Durrett v. Jenkins Brickyard, Inc.*, 678 F.2d 911, 917 (11th Cir.1982); *see Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974). Accordingly, after reviewing defendant's documentation of costs and attorneys fees, the court awards defendant $1,238.00 costs and $2,000.00 attorneys' fees based upon plaintiff's ability to pay.