LaVonne **WILLIAMS**, Plaintiff,

v.

**HEALTH MAINTENANCE ORGANIZATION OF FLORIDA, a/k/a HMO of Florida, Defendant.**

**No. 85–1286–CIV ORL–18.**

United States District Court,
M.D. Florida,
Orlando Division.

March 1, 1988.

Beryl B. Thompson, Orlando, Fla., for plaintiff.

Gary R. Kessler, Joe C. Ashworth, Atlanta, Ga., and Harvey B. Hardy, Lakeland, Fla., for defendant.

## ORDER

GEORGE KENDALL SHARP,
District Judge.

This case came before the court for a non jury trial. Pursuant to Federal Rule of Civil Procedure 52, the court enters the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

Plaintiff, Lavonne Williams, is a black female who brings this action on charges of failure to hire, failure to train and constructive discharge. Defendant, HMO of Florida (HMOFL) is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* HMOFL is a wholly-owned subsidiary of U.S. Healthcare, Incorporated. Defendant and its parent company are involved in the development, marketing and administration of health maintenance organizations to employers and employees whom HMOFL seeks to enroll as members. HMOFL opened an Orlando office in the fall of 1983. The marketing department of the Orlando office was then comprised of a marketing director, two marketing managers, marketing representatives, member relations representatives, marketing administrators and a receptionist.

In January of 1984 plaintiff applied for a job as marketing representative (MR), pursuant to an ad in the Orlando Sentinel. Job requirements included a bachelors degree, strong interpersonal and group communication skills and the ability to work independently. Plaintiff applied in writing to the stated address, enclosing a copy of her resume which indicated she had received a bachelors degree in Business Education from Southern College. Plaintiff testified that she had graduated with a 3.5 grade point average. In addition, plaintiff had taken postgraduate classes at the University of Central Florida.

Plaintiff's resume indicated she had several years of work experience in the health care and insurance fields. Additionally, plaintiff had experience as an office manager for the Orlando Legal Aid Society, where she had a secretarial assistant who did her typing. However, none of plaintiff's previous jobs was in sales, and although plaintiff claimed to have experience speaking before small groups of people, she admitted having no experience speaking before groups of 20 or more, as was required for the position of MR.

Plaintiff was not hired as an MR but was subsequently hired as a marketing administrator (MA). Plaintiff testified that while training as a MA, Heidi Grey (Grey), a marketing manager for defendant, stated that "defendant was looking for more young green-eyed MRs like herself." Grey denied making any such statement.

The series of events leading to plaintiff's employment are as follows. After being rejected for the job of MR, defendant called plaintiff back to interview for the position of member relations representative (MRR). Typing was not a prerequisite for the job of MRR. Plaintiff was offered the position but refused it because the pay was too low. Following the interview, Plaintiff spoke with Dan Tillotson (Tillotson), defendant's Orlando marketing director, regarding possible employment opportunities. As a result of this meeting Tillotson offered plaintiff a marketing administrator (MA) position, which paid $13,000.00, $3000.00 more than the MRR position. Tillotson indicated plaintiff was qualified for the job and would eventually be the senior MA, working directly under Tillotson himself.

Defendant's standard business practice was to administer a typing test to each individual who applied for the MA position. The typing test was routinely administered during the first set of interviews with the marketing managers. Since plaintiff did not follow the standard interview process for MAs the typing test was inadvertently overlooked. As a result defendant did not know plaintiff's level of typing proficiency. While plaintiff testified she was capable of doing light typing and had attained a level of 45 words per minute while working at the Legal Aid Society the previous year, testimony indicated plaintiff did not possess the level of proficiency normally required of MAs.

Plaintiff received a letter, dated February 29, 1984, confirming her employment. (Plaintiff's exhibit 4). The letter stated plaintiff had been selected from among a number of applicants based upon her qualities and qualifications. In addition, the letter said defendant would provide training at its corporate headquarters in Willow Grove, Pennsylvania.

Plaintiff commenced employment on March 5, 1984. That same day Grey asked plaintiff to sign an employer-employee agreement setting forth plaintiff's job duties and responsibilities. Grey testified it was customary to send new employees a confirmation letter prior to their commencing work, and at the start of their employment have them execute an employer-employee agreement specifically listing the employee's job duties.

Grey stated that the job responsibilities listed in the employer-employee agreement were extracted from the job description outline developed for MAs. Plaintiff testified she protested signing the agreement because it failed to properly reflect her duties, as the majority of those duties listed involved typing. Plaintiff said Grey told her this was not an accurate description of her responsibilities but to sign it anyway. Grey denied saying anything to that effect. Plaintiff signed the employer-employee agreement without voicing her protest to Tillotson.

Shortly after her arrival, plaintiff was sent to Jacksonville for training. Angelo Divita (Divita), vice-president of sales for defendant's Pennsylvania office, testified that the Jacksonville office had been set up just months prior to the Orlando office. Divita testified that the start up phase for each office lasted approximately three to six months and that the Orlando office was in its start up phase during plaintiff's employ. Divita added that during the start up phase there is an established routine with respect to basic tasks but not with respect to targeting the specific market. Divita did not say whether Jacksonville was still in the start up phase when plaintiff trained there.

While in Jacksonville plaintiff worked with Joan Kosumal (Kosumal). Plaintiff testified she spent most of her time helping Kosumal assemble packets. Plaintiff said she did not engage in nor discuss typing with Kosumal.

Thereafter, plaintiff was sent to the home office in Pennsylvania to train for two weeks. Joan Bender (Bender), assistant vice-president in charge of marketing and purchasing, met plaintiff at the airport. Bender was responsible for hiring and training MAs and stated that the standard procedure in all offices was to give prospective MAs a typing test prior to their hire. Bender added that typing was crucial to the job of MA and that MAs were expected to know how to type before coming to Pennsylvania to train. Bender testified that plaintiff was the only MA sent for training who had not been given a typing test to determine her proficiency. All other MAs who had trained in Pennsylvania met or exceeded defendant's proficiency standards. Bender stated that no formal training program was in existence when plaintiff trained, but that training consisted of bringing MAs to Pennsylvania for a couple of weeks for hands on experience, comprised of typing, familiarizing oneself with defendant's various forms and procedures and learning how to assemble sales packets.

Returning to the events that took place, plaintiff testified that Bender seemed nervous when she picked plaintiff up from the airport. Bender told plaintiff her son was ill and another HMOFL employee would take plaintiff to lunch. Lorraine McNair took plaintiff to lunch and showed her around the area.

Plaintiff began training the following day. She reported directly to Bender. Plaintiff testified that Bender indicated that she was very busy and did not have time to train plaintiff. Bender instructed plaintiff to sit in on a MRR training class. Bender testified it was not unusual for MAs to sit in on these training sessions because of the interrelationship between MAs, MRs and MRRs. Plaintiff testified that there were no blacks in the training

session and that she only met one black during her entire time in Pennsylvania.

That afternoon Bender asked another employee, Pam Martin (Martin), to train plaintiff. Bender testified Martin was to train plaintiff regarding various "marketing functions." Plaintiff testified Martin showed her a MA training manual, which plaintiff had requested from a number of employees since her employment began. Plaintiff asked to take the manual with her but was told she would need the proper authorization to do so. Plaintiff said that when she asked Martin to explain the manual, Martin refused. At the end of the afternoon plaintiff was turned over to Lorraine McNair who plaintiff testified was supposed to "keep plaintiff busy" for the remainder of the day.

Bender testified that the manual plaintiff referred to was not a training manual but a reference manual and that a training manual was in the process of being developed. Bender stated that there was only one reference manual per marketing department and that everyone was expected to share. Bender added that a manual should have been available in the Orlando office for plaintiff's use.

The next morning plaintiff reported to Martin who asked another employee, Anne, whose last name is not contained in the record and, thus, will be referred to on a first-name basis, to assist plaintiff. Anne was herself a MA who had trained about a half dozen other MAs in the past. Anne worked with plaintiff all morning and part of the afternoon. Plaintiff testified Anne was rude and hostile towards her. Plaintiff stated Anne gave her something to type without giving her instructions, telling her the purpose of the typing exercise or that it would subsequently be reviewed. Plaintiff added she was twice asked to move from the typing station where she was sitting.

At the end of the third day plaintiff spoke to Lorraine McNair about the inadequacy of training and lack of cooperation she was receiving from defendant's employees. That same afternoon plaintiff told Bender she wanted to speak with the president of HMOFL regarding her training. Bender responded by telling plaintiff to come back the next morning.

That same afternoon, Anne informed Bender that plaintiff lacked the necessary typing skills needed to perform as MA. Bender contacted Mr. Rogers (Rogers), vice president of marketing, who suggested contacting Tillotson in the Orlando office. Tillotson acknowledged that plaintiff had admitted her typing skills were "a little rusty," but Tillotson said he felt her other attributes outweighed this deficiency. Bender stated she disagreed with Tillotson's assessment, primarily because plaintiff's typing skills were worse than Tillotson had anticipated.

The following morning Bender reviewed plaintiff's typing exercise from the previous afternoon and said she found many errors and formatting problems. Based on the verbal reports of Anne (last name unknown) and Martin, and on her own evaluation of plaintiff's typing skills, Bender concluded plaintiff was unqualified for the job and should be dismissed. Bender discussed the matter in person with Martin, Mr. Skillman (Skillman), another of HMFLO's vice-presidents, and Rogers and spoke with Tillotson via conference calling. All parties agreed with Bender's assessment.

That morning when plaintiff arrived she was called into Bender's office whereupon Bender and Rogers terminated plaintiff's employment. Plaintiff testified Rogers said they had made a mistake in hiring plaintiff and that plaintiff "did not fit in." Before leaving plaintiff asked to speak with defendant's president, Mr. Abramson (Abramson), but was told he was unavailable. Plaintiff left very upset.

Plaintiff went back to her sleeping quarters to gather her belongings and again telephoned defendant's office to speak with Abramson, but was told he was unavailable. Plaintiff returned to defendant's office demanding to speak with Abramson. Once permitted to speak with Abramson she informed him of what had transpired. Abramson inquired about plaintiff's background and asked whether plaintiff had been given a typing test to which plaintiff

replied no. Abramson asked Bender why plaintiff had been terminated to which Bender responded she could not type.

Abramson apologized for any mistreatment plaintiff might have suffered and asked plaintiff to stay on as a MA, provided she enroll in outside typing classes upon returning to Orlando. Abramson gave plaintiff the option of continuing her training in Pennsylvania or returning to Orlando and training at a later date. Plaintiff chose to return to Orlando to consider Abramson's offer of reinstatement.

Upon her arrival at the airport, plaintiff discovered defendant had failed to make the proper arrangement for her return flight. However, after some difficulty and confusion the proper arrangements were made. Plaintiff returned to Orlando.

Plaintiff testified she was disturbed by the incident. She said she felt humiliated and mistreated. She felt like she had not been given a fair opportunity in Pennsylvania but was judged on her race. However, plaintiff decided to keep her position with defendant and return to work in the Orlando office. She telephoned Abramson the next day regarding her decision.

Upon return to the Orlando office plaintiff's primary duties were assembling packets and ordering supplies. Plaintiff said she again requested a training or reference manual but never received it. Plaintiff also stated she requested various supplies from the Pennsylvania office which she never received. Plaintiff stated she informed Tillotson of this problem. However, both Bender and Divita testified that supplies were often delayed because of the distance between Orlando and the home office and that white MAs as well had trouble getting supplies in a timely fashion.

Regarding the assembly of packets, plaintiff testified that her desk, which was in the main office area prior to her trip to Pennsylvania, was now located in the stockroom. Grey testified she was unaware that plaintiff had been told she had to stay in the stockroom. Grey further stated that plaintiff's desk was in the stockroom for two reasons. First, because that is where the materials for assembling packets were located and it was considerably easier to assemble packets in the stockroom. In fact, it was standard procedure for all MAs to assemble packets in the stockroom. In addition, Grey indicated, through a drawing she sketched of defendant's Orlando office, that there was little or no room in the main office area because of the ongoing expansion of personnel.

Regarding the expansion of personnel, Grey testified that there was at least one full time MA in February. Grey stated she was unsure if others were hired in March, but two other MAs were hired after the beginning of April. One of those hired was Sarah, who was initially hired as a temporary to perform plaintiff's typing duties until plaintiff learned to type proficiently. All three MAs hired were white females and Grey described their typing skills as either "strong" or "excellent."

Plaintiff testified that the temporary MA, Sarah, worked directly with Tillotson, sat at plaintiff's desk, and did most if not all of the phone calling and message taking. In addition, plaintiff testified that Sarah was given the key to the file cabinet, the weekly planner and reminder for MRs, the daily telephone log and the rolodex. Plaintiff testified Sarah told her that Tillotson promised Sarah she would be sent to Pennsylvania for training to take over plaintiff's position.

Divita testified that typing was an essential part of almost every facet of a MAs job and that a MA's inability to type would substantially impair her ability to perform other MA duties. Divita stated that MAs took messages and made calls for MRs. Divita said that often MRs would dictate information for MAs to transcribe or phone in information that MAs were required to type up immediately, which made it necessary for MAs to keep in close contact with their respective MRs. Divita testified that each MR was paired with one MA, and they operated as a unit. Divita stated it was imperative that each MR be responsible for contacting and be able to rely on one particular MA. Divita stated this was precisely why a temporary, such as Sarah, would be assigned the telephone duties, with the

attendant telephone log and rolodex, and why she would be responsible for the MR's weekly planner, while plaintiff would be primarily responsible for assembling packets.

Divita further testified that assembling support materials was a very important task, rarely entrusted to temporary employees unless at the specific direction of a supervisor. Grey and Bender also testified that assembling packets was an important part of a MA's job, and Bender added that all MAs, black and white, assembled packets. Divita stated that at times everyone in the office was required to assist in assembling materials.

Plaintiff testified she inquired about typing courses and found that they were only offered at night. Plaintiff interpreted this to mean that she would have to work full time during the day and take classes at night, although she was never specifically told this would be the arrangement. In addition, plaintiff claimed she already possessed some typing skills, and perhaps felt an extensive typing course was unnecessary, but, admittedly, never made defendant aware of this fact.

A couple of weeks after returning to the Orlando office, plaintiff terminated her employment. Plaintiff immediately began a new job paying $1300.00 more per annum. Thereafter, plaintiff filed charges with the Orlando Department of Human Relations and the EEOC alleging age and race discrimination. The EEOC made a "no reasonable cause" determination and subsequently sent plaintiff a right to sue letter which resulted in the instant action being taken.

## II. CONCLUSIONS OF LAW

■ Plaintiff brings this action under Title VII, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981. In an employment action brought under 42 U.S.C. § 1981 the court may apply the same standard of proof developed under Title VII. *Nesmith v. Martin Marietta Aerospace*, 676 F.Supp. 1183, (M.D.Fla.1987), *aff'd.*, 833 F.2d 1489 (per curiam). Plaintiff is proceeding on a "disparate treatment" theory, alleging that because of her race she was treated differently than those outside the protected class.

There are two ways to prove racially based employment discrimination. A party may prove discrimination by producing direct evidence that the employer acted with discriminatory intent. *McCarthney v. Griffin–Spalding County Board of Education*, 791 F.2d 1549, 1553 (11th Cir.1986). The more common method is through use of circumstantial evidence supporting an inference of discrimination. *Lee v. Russell County Board of Education*, 684 F.2d 769, 773–74 (11th Cir.1982). The latter method embodies the *McDonnell Douglas* framework, *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which provides an analysis for determining the existence of intentional discrimination. *Lee*, 684 F.2d at 773 (citing *Texas Department of Community Affair v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1980)).

■ In the instant case plaintiff testified that at least one of defendant's agents made racial comments towards her. Normally, this might be considered direct evidence of discrimination not subject to the *McDonnell Douglas* standard. However, the law is clear that statements made by non-decision-makers in defendant's employ cannot be attributed to defendant's management officials and, therefore, are not attributable to defendant. *See, e.g. Feazell v. Tropicana Products, Inc.*, 819 F.2d 1036, 1041 (11th Cir.1987); *Fowler v. Carrollton Public Library*, 799 F.2d 976 (5th Cir.1986); *Autry v. North Carolina Department of Human Resources*, 641 F.Supp. 1492 (D.C.N.C.1986), *aff'd.*, 820 F.2d 1384 (4th Cir.1987); *McCann v. Delaware River Port Authority*, 548 F.Supp. 1206 (E.D.Pa.1982), *aff'd.*, 725 F.2d 669 (3rd Cir 1983). Therefore, the alleged statements cannot be considered in determining the legality of defendant's conduct. Because all remaining evidence adduced at trial was circumstantial, application of *McDonnell Douglas* is appropriate.

■ The three step analysis espoused in *McDonnell Douglas* requires the plaintiff

to establish a prima facie case of racial discrimination. 411 U.S. at 802, 93 S.Ct. at 1824. Once plaintiff establishes a prima facie case, the burden then "must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* Defendant has only a burden of production, not persuasion, meaning that defendant need only raise a genuine issue of fact regarding whether it discriminated against plaintiff. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1904; *Lincoln v. Board of Regents of the University System of Georgia,* 697 F.2d 928, 937 (11th Cir.), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983). If defendant is successful in rebutting plaintiff's presumption of discrimination, plaintiff then must establish that the reasons proffered by defendant are pretextual. *Lincoln,* 697 F.2d at 937–38.

### A. Failure to Hire

■ At the close of plaintiff's case, the court granted defendant's motion for involuntary dismissal on the issue of failure to hire. To establish the requisite prima facie case of employment discrimination arising out of failure to hire a party must show: 1) that she or he is a member of a protected class; 2) that she or he applied and was qualified for a job for which the employer was seeking applicants: 3) that despite her or his qualifications, she or he was rejected; and 4) that after this rejection the position remained open or was filled by a person not within the protected class. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677.

*Welborn v. Reynolds Metals Co.,* 810 F.2d 1026 (11th Cir.1987).

Plaintiff established that she is within the protected class. However, plaintiff failed to make a prima facie showing that she was qualified for the position of MR. Plaintiff had a bachelors degree and several years of work experience, but had no prior sales experience or experience speaking to groups of 20 or more. Furthermore, plaintiff failed to present evidence of who, if anyone, was hired in place of plaintiff, or whether that person was outside the protected class. Plaintiff failed to establish the qualifications of any MRs hired. Similarly, she failed to present evidence that she was equally or more qualified than other MRs hired. For the stated reasons the court granted defendant's motion for involuntary dismissal.

### B. Failure to Train

■ The Seventh Circuit articulated the *McDonnell Douglas* analysis specifically applicable to failure to train claims. To establish a prima facie case of failure to train plaintiff must demonstrate that "she is a member of a protected class, that he or she is otherwise similarly situated to members of the unprotected class, and that he or she was treated differently from members of the unprotected class." *Ramsey v. American Air Filter Company, Inc.,* 772 F.2d 1303 (7th Cir.1985). While plaintiff established that she was a member of the protected class, she failed to establish that she was similarly situated to those outside the protected class. The testimony clearly indicates that plaintiff did not possess the requisite typing skills, while all the other MAs hired were skilled typist who typed approximately 70 wpm or more and who had been administered a typing test to determine their proficiency. Regarding the third factor, plaintiff was not refused training despite her typing deficiency. Once defendant's president, Abramson, learned that plaintiff had been terminated he immediately offered to reinstate her, conditioned on her taking typing courses at defendant's expense. Abramson stated plaintiff could continue her training in Pennsylvania, or return to Pennsylvania to train at a later date. *See generally Ramsey,* 772 F.2d at 1308–09 (finding of discrimination where black plaintiff was completely denied all opportunity to train); *compare Robinson v. Montgomery Ward and Company, Inc.,* 823 F.2d 793, 797–98 (4th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 773, 98 L.Ed. 2d 860 (1988) (no finding of discrimination where black plaintiff was not forever denied opportunity to train but had not yet received necessary training to qualify for particular position).

Regarding any allegation that plaintiff was refused training prior to Abramson's offer of reinstatement, the testimony indicates that during her four days in Pennsylvania plaintiff attended at least one training session and participated in "hands on" training relevant to her duties as MA. Plaintiff bases her failure to train claim on the alleged fact that those who trained her were hostile and unfriendly. However, the Eleventh Circuit has made clear that "[p]ersonal animosity is not the equivalent of sex discrimination and is not proscribed by Title VII." *McCollum v. Bolger,* 794 F.2d 602, 611 (11th Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 883, 93 L.Ed.2d 836 (1987).

Plaintiff relies on *Washington v. Kroger,* 506 F.Supp. 1158 (W.D.Mo.1981), *vacated,* 671 F.2d 1072 (8th Cir.1982), to support her position that she established a prima facie case of failure to train. Upon examination the court finds that the Eight Circuit subsequently vacated the district court opinion, including that portion finding that plaintiff successfully established a cause of action based on failure to train. *Washington v. Kroger Company,* 671 F.2d 1072 (8th Cir.1982). The appeals court remanded the case for further proceedings in light of previously undisclosed evidence. However, with regard to the facts established in the earlier proceeding upon which plaintiff relies, the Eight Circuit determined that plaintiff had not proven race or sex discrimination.

▇ Even assuming plaintiff established a prima facie case of failure to train, defendant articulated nondiscriminatory reasons for its actions sufficient to rebut a presumption of discrimination. As indicated by Bender's testimony, MAs were expected to be proficient typist before going to Pennsylvania to train. In fact, Divita and Bender both testified that a substantial portion of MA training involved typing and a MA's inability to type would seriously impede the training process. Therefore, the court concludes that, if plaintiff was refused training during any portion of her time in Pennsylvania, it was because she lacked the requisite skills necessary to participate in defendant's training program, not because of her race.

### C. Constructive Discharge

▇ Plaintiff also alleges racial discrimination on the basis of constructive discharge. To establish a case of constructive discharge "the employee must prove that his working conditions were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Wardwell v. School Board of Palm Beach County Florida,* 786 F.2d 1554 (11th Cir.1986) (citing *Bourque v. Powell Electrical Manufacturing Company,* 617 F.2d 61, 65 (5th Cir.1980)).

Plaintiff claims that upon return to the Orlando office she was relegated to the stockroom and stripped of virtually all her duties. Defendant hired a temporary to fulfill all plaintiff's typing responsibilities. Plaintiff testified this temporary employee subsequently informed plaintiff she was hired to replace plaintiff and was being sent to Pennsylvania to train for plaintiff's position. Finally, plaintiff testified that tillotson told plaintiff she would not want to go back to Pennsylvania because of her past experience there.

While the above evidence establishes a prima facie case of constructive discharge, defendant adequately rebutted plaintiff's presumption. Both Grey and Divita testified that assembling packets was a critical part of a MA's job. They testified that almost all other MA duties involved typing and that plaintiff's temporary MA was assigned the remaining responsibilities because they involved a substantial amount of typing. Grey testified that plaintiff's desk was located in the stockroom because the packets were assembled there, all needed materials were located there and there was not enough space for MAs to assemble packets at their desks. Plaintiff admitted she never voiced her dissatisfaction with being in the stockroom nor was she ever told she would have to stay in the stockroom indefinitely. Grey testified defendant was unaware of plaintiff's dissatisfaction and remained under the impression that plaintiff would take typing courses

and would eventually resume all her MA duties. Regarding the temporary MA's comment to plaintiff, it was made by a non-decision-maker and cannot be imputed to defendant. *Feazell,* 819 F.2d at 1041. Finally, with respect to Tillotson's comment that plaintiff would not want to return to Pennsylvania, the statement was made in the context of plaintiff's inquiry about another position. Plaintiff was never told she could not return to Pennsylvania for MA training. In fact, Abramson, president of HMFLO, specifically told plaintiff she could return for training at a future date.

Although plaintiff may have disliked assembling packets, testimony indicates packet assembly was a significant part of a MA's job and one of the few duties that did not require typing. In fact, plaintiff herself testified that Kosumal, plaintiff's counterpart in defendant's Jacksonville office, spent a substantial portion of her time assembling packets. Plaintiff claims that defendant did everything within its power to force plaintiff to leave. However, the evidence indicates that defendant went out of its way to accommodate plaintiff's unique situation. Defendant hired a temporary employee to perform all plaintiff's typing duties, without any reduction in plaintiff's pay. Defendant offered to pay for plaintiff's typing course. Plaintiff claims it was too difficult to take typing classes at night and work all day, but she never brought this problem to the attention of her supervisors.

In conclusion, the court finds plaintiff left of her own volition. A reasonable person in plaintiff's position might have concluded that other jobs more closely fit their particular needs and qualifications, but a reasonable person would not have felt compelled to leave defendant's employ. Therefore, the court finds plaintiff failed to establish constructive discharge.

### D. Attorney's Fees

■ Title VII, 42 U.S.C. § 2000e–5(k), provides that a district court may, in its discretion, award attorney's fees to a prevailing defendant upon a finding that plaintiff's action was "frivolous, unreasonable, or without foundation, even though not

brought in subjective bad faith." *Christianburg Garment Co. v. Equal Employment Opportunity Commission,* 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1977). The issue is not which party ultimately prevails, but whether plaintiff's suit was "so lacking in arguable merit as to be groundless or without foundation." *Sullivan v. School Board of Pinellas County,* 773 F.2d 1182, 1189 (11th Cir.1985).

Factors important in determining whether attorney's fees are appropriate include whether the court dismissed the case prior to trial and whether the plaintiff made out a prima facie case. *Id.* at 1189. In the instant case defendants were granted a directed verdict on plaintiff's failure to hire claim. However, the other claims withstood defendant's motion for a directed verdict and were decided on the merits. Furthermore, defendants are not automatically entitled to attorney's fees upon the granting of a directed verdict in their favor. The court must make an additional finding that the action was frivolous unreasonable and lacking in foundation. *Christianburg,* 434 U.S. at 421, 98 S.Ct. at 700; *see Jackson v. Color Tile,* 638 F.Supp. 62, 64 (N.D. Miss.), *aff'd.,* 803 F.2d 201 (5th Cir.1986). Additionally, while plaintiff did not establish a prima facie case of failure to hire, plaintiff did establish a prima facie case of constructive discharge and, arguably, established a prima facie case of failure to train.

In conclusion, the court finds plaintiff's claims, while unsuccessful, were not so lacking in foundation nor so frivolous as to warrant an award of attorney's fees.

Accordingly, plaintiff shall not recover on any of its discrimination claims and defendant is not entitled to attorney's fees. Each party shall bear its own costs. The clerk shall enter judgment in accordance with the above findings.